All right, our second case for this morning is Common Cause Indiana and others against Connie Lawson. Mr. Fischer. Thank you, Chief Judge Wood, and may it please the Court. The cross-check program merely carries out the wishes of individual voters to be registered in a new state and rather than a previous state of residence. But you know, Mr. Fischer, I want to get literal with you since we seem to be having a battle of the literalists here. And when I look at D and I see the language, unless the registrant confirms in writing to whom, to the state, is the seems to me that that language requires a direct communication from the registrant to the state to say, I'm done with you. Especially given the fact that in a great number of states, not Indiana, I realize, but in a great number of states, it's not even unlawful to be registered in two places at once. You know, maybe your grandmother's sick and you're spending a lot of time in State B and she gets better and you move back to State A where you're still registered and you vote in one place. It's certainly unlawful to vote in two places, but being registered in two places isn't unlawful. So this whole statute, the federal statute, seems to turn on the accuracy check that happens when the registrant directly communicates with the state. I've changed my registration. I moved from Indianapolis to Des Moines. Goodbye. And I don't, your reading troubles me very much that the registrant's act of, with the quadruple hearsay problem that we have, that the registrant has supposedly registered in some other state, is the registrant confirming to the state in writing that the registrant has changed residence. I think that's over reading the text. I don't think the text supports that requirement. I think you're under reading it, actually. A state shall not remove unless the registrant confirms in writing. Confirm to whom? Well, I think it confirms through its registration. I don't think it has to be specifically to the state. I think when you've got a system that has state-to-state communication over new registrations, it seems to me you're communicating with both states in that regard. Now, I mean, the accuracy is pretty pathetic for this system. Nobody says Indiana can't use cross-check, but the question is when they spot somebody, do they have to notify the registrar, just as you would with a postal service? Well, candidly, I don't know how we could say the accuracy is pathetic. The thing's never been enforced. It's been preliminarily enjoined. Well, but it was it was used before this. Not this system. The old system was used. The old system was used, which used cross-check, which got the matches, so to speak, but the matches were plagued with false positives. But we also don't know that that yielded any erroneous canceled registrations. All we know is some, you know, it's some intermediate step. There were some variations in, you know, what different local officials wanted to do. There's no analysis of what that yielded, and I know this because until this past federal election, there had not been sufficient election cycles to cancel anyone's registration coming out of the prior use of cross-check. We have no idea what the results were going to be, and we still don't. Well, nationwide there was more experience. Well, but not in Indiana, and that's that's what we're worried with, not nationwide. We're worried with the Indiana statute. We're worried about the system, but in any event, I would say, literally speaking, this system is one that says, really gives the states two options. You can get rid of somebody that you think is a double registrant if you ask them, or you can go through this lengthier process. No, I don't think that's right, because the statute's not written in a way as to say these are the options for states. It's written in a way as to say states have to do, have to have a reasonable voterless maintenance system, and here's a way to do it. Well, that's true, but what about the language? It's all about a state shall not remove the name of a registrant unless a state, you know, these are voter protective. The name of a registrant may not be removed from the official list of eligible voters except, A, at the request of the registrant. Right, and that's what we've got. I don't see how we know. When I register, am I requesting Indiana to do anything? What a weird interpretation of the word request. I don't understand how it's at all weird to say that a new registration is implicitly a request to cancel the old one. Why would you want to be registered in two separate places? Because you don't know where you're going to live. You've got to, I mean, that's part of the system, is we want to deter fraud. We don't want to have multiple registrants. It's not fraud. You're only going to vote in one place. Oh, but of course the Congress decided that voter registration rules were ripe for fraud. That's why we have this entire Act, or this part of the Act. Well, there's a, so what do you make of the fact that in most states it's not unlawful? Okay, the National Conference of State Legislators has a January 4 study called Double Voting, which reports that having two open voter registrations is not illegal in any state except Indiana. Well, I think that's something that Indiana has as its prerogative, and I certainly think also if you look at the... But I'm just saying if somebody's going to Iowa, they're not violating the law of Iowa. Maybe they started out in Indiana and they go to Iowa, or maybe they start out in Illinois and they go to Iowa. I'm still trying to understand the legitimacy of having two open voter registrations. Because you don't know where you're going to live. I think you have some obligation to make that commitment when you're trying to decide where you're registering to vote. But then you only vote in one place. Yeah, I understand. But the federal statutes on this don't put Indiana in a position of having to do exactly what other states are doing. And I think Indiana... No, no, no, certainly it doesn't. But I'm just, again, that's why I get back to the literal language of the statute, which is all restrictions on removing names of registrants unless the registrant confirms in writing. And you, boy, you're leveraging that language pretty far. Well, look, you have focused on the confirmed, so I'm probably not going to persuade you there. But maybe if we focus on the A3A, which is at the request of the registrant. Again, now you have a view that a new registration is not a request to cancel the old. Certainly, I think Congress would disagree. And I know this because I refer you to the legislative history, where the both... I thought we weren't supposed to use legislative history. Well, if you're into this sort of thing. I mean, we have some... I have colleagues on this court, and I won't speak for these two. But I certainly have colleagues on this court. I'm merely trying to suggest that there is some support out there in the universe for the position. I'm advocating. Mr. Fisher, have you ever argued for legislative history? Your Honor, we don't have legislative history in Indiana. This is all new to me. I've got it, so I'm going to use it. So here's what we've got, which are statements from the House and Senate reports that a new registration would be exactly the kind of thing that would be a communication to say that it's the request of the registrant. And that, I think, makes sense. So somebody who lived in Indiana moves to Minnesota. They register. And then Minnesota reports to Kansas that this person, John Smith, Jr., has registered in Minnesota. And the Kansas people report back to Secretary of State that John Smith, Jr. is now in Minnesota. And that person reports over to the county official that John Smith, Jr. is in Minnesota. In the meantime, John Smith, Jr., who moved to Minnesota, lost the job that he moved to Minnesota for and realizes, gee, I'm not really going to be in Minnesota on Election Day. After all, I'm moving back to Indianapolis, where at least I have some family support. And luckily, I'm still registered in Indiana and never steps foot in the state of Minnesota again. I think in that scenario, it's crazy to say that the Minnesota registration is a request not to be registered in Indiana. I certainly don't think it's crazy. I would have thought John Smith, Jr., having been vigilant enough to register to vote in Minnesota when he thought he was going to be there, would also be of the sort that would be vigilant enough to check on it, at the very least, once he moves back to Indiana. I don't understand why we would... Which could also happen if he sends a letter directly to the Indiana voter registration office. But it's much less likely, if he has a direct communication... I don't think we have any evidence that shows that. We have no evidence that shows that. Mr. Fischer, let me go back to the language of Section D, please, that says the registrant, the voter is the one who has to confirm in writing that the registrant has changed residence to a place outside. Regardless of who that confirmation has to go to, it has to come from the registrant. And here, Indiana is relying on cross-check. I think you've conceded you don't look at the change of registration form. That's not what you're relying on. You're purely relying on this cross-check system. How is that confirmation from the voter? Well, so, two points. First of all, I want to... And I don't want to go to legislative history. Just looking at the plain language... I'm not going to do that. I got that off my chest. Here we are. We'll talk about this particular issue, which is, there are two concerns. One of which is, the way the statute's written, it's not simply the cross-check information. And this is just, I want to make sure that we understand how the statute operates. It comes in, if there is a match of the first name, last name, and date of birth, you pass the first threshold for an accuracy check. Then there is the 70-point scale you implement. Then, if that passes that, you move on to the county. Then they are required to make a separate determination that it's the same person, and that the Indiana registration was the earlier of the two. But they're not required to go back and look at the voter's registration in the other state. I understand. Let me get to that through two responses. The first one is, we don't have any experience implementing this statute. We don't know what directives the election division may come up with that would tell the local officials what to do. They have their own duties and responsibilities. I'm not trying to suggest that there is an ability to control what they do. What I'm saying is, we don't have any guidance, and we don't have any response to that guidance to know exactly what they're going to do. But based on the record from the preliminary injunction hearing, they're not required to go back and look at what actually came from the supposed registration. There is no statutory directive that they do that. Agreed. Now, with respect to, I think, your more fundamental question, the registrant has to provide the confirmation. Correct. When the registrant registers in another state, that is the registrant providing the confirmation. But not directly to Indiana. I think what Judge St. Eve is pointing out is, all Indiana hears from is this intermediary. So you need to say somehow that the registrant has done it through the intermediary. Well, right. But that's the assumption. But that's important. Well, I was trying to understand Judge St. Eve's question, and I thought the question was simply, where is the source? And the source is the registrant. How do you know that? Because the source has to be the registrant. But Indiana, as I understand it, is relying on cross-check and doesn't go back to the source. There is no mandate that it do it. They can't. But let's also... But the preliminary injunction record suggests that they're not. Well, that's based on administration of the prior program. We don't have any experience under this program. The fact is, the district judge was faced with issuing a preliminary injunction. Perhaps you'll win on the merits if you show that they all... How can we win on the merits if we can't implement the program? How do we know it's coming from the registrant? Well, how do you ever... Let me finish, please. Oh, I'm sorry. The plain language of the statute, it is the voter who has to confirm in writing that the voter has changed residence. Again, regardless of who that confirmation goes to, if you're relying on cross-check and there's no requirement that you, Indiana, look at that confirmation from the voter, how is it that you're relying on the voter's confirmation in writing? I think the question that you're raising is a question that applies equally to anything that would be even more direct. How do we know that the letter that comes in the door is really from this person? No, but that's a different matter altogether. I think if a different entity, human being, company, state, reached something to you, then you'd have the next layer, which is what we have here. We rely on the mail. We rely on direct communication. If somebody walks in the door, you don't. If you walk in the door, do I really know that you're Tom Fisher? Actually, I do, but I wouldn't if I didn't know you. I think you were starting to go to the uniformity question. I'm not talking about the uniformity. I'm just talking about how do we know, how do you know that it's the voter who's confirming and writing the change of residence when you're relying on a third-party system? Let me try to answer it a slightly different way, which is to say, what I hear you asking is, are we concerned about some fraudulent or mistaken registration in the name of another person? That's not what I'm asking because it doesn't matter what the underlying concern is. I'm just trying to apply and make sure that you, Indiana, that you're applying the plain language in the statute, which requires that the registrant confirm in writing, regardless of who that confirmation is to. How is it that you can rely on the registrant's confirmation in writing when you're relying on a third-party system and have no idea if it's the registrant? I don't think it's fair to say we have no idea. I think it's perfectly reasonable for us to rely on what the other cross-check states are uploading and what we're being told by cross-check. We have other systems in place to safeguard against erroneous matches. Can I talk about that for just a minute? We can come back to this registrant point. I know you're relying significantly, I'll say, on the confidence factor requirements that are the more recent additions to the law. But most of them, well, a lot of them seem to me, as a practical matter, impossible. And I can only add up 65 points of the ones that I think you're going to have, and that's not enough because you need 75. So full Social Security number gets 40 points, but the record in this case suggests that that's basically never there. I mean, in fact, almost every government, including Medicare and everyone else, is going away from full Social Security numbers because of identity fraud issues. So, so much for that one. That's A. B, last four digits of the Social Security number gets 10 points. Not clear that that's even coming through on this record. C, I don't know why the other state would have the Indiana driver's license or identification card number. That gets 50 points. But because you don't have that original form that Judge St. Eve is talking about, you're not going to have what the other state thinks the driver's license number is. You're only, maybe you'll have the Indiana number, but it's not a matching function. Date of birth, sure, 25 points. Last name, first name, 30 points together, 15 apiece, fine. Middle name, 5 points. Suffix, 5 points. That gets us up to 65. Street address, I don't know why that's a matching factor, and I don't know why zip code is. So I don't think that these confidence factors actually cross the finish line for you. Well, then no one's registration is ever going to be canceled. If you can't get to 75, it never gets passed on. Well, but it doesn't make the system more reliable. What Congress says is that the system is reliable if the registrant confirms in writing this change of registrant, or if the registrant has failed to respond to the notice that's described in paragraph 2. There's a big thing about the notice, and you've got this two-year system, which may be annoyingly long, or two cycles, sorry, so four years. But the federal statute seems to provide what Congress has decided is enough of an assurance of reliability, and the Indiana system falls short. First of all, in the Houston case, the Supreme Court said, we're not to look at the NBRA as Congress telling the states exactly what to do. But they also said the reason in the Houston case that what Ohio was doing was all right, Justice Alito says this repeatedly, they were following to the letter the federal statute. Well, we think we are too, and I think with respect to the number of points, the scenario you've outlined where no one ever adds up to 75 just means there won't be any erroneous cancellations. I'd like to reserve the remainder of my time. Oh, sure, I'm sorry. All right, Ms. Perez. Good morning. The entirety of the Solicitor General's opinion depends upon this court concluding that cross-check output is a trustworthy inference of a completed voter registration form. And just a minute ago in the colloquy, I heard him conflating cross-check output with the voter registration database, which is, again, as Your Honor noted, one step removed from what the voter did. So don't we operate, though, under assumptions of regularity of administrative processes? What would cause one to think that the state that has reported to the Kansas Secretary of State is somehow making an unreliable report? Well, I would first like to remind the court that the NVRA makes very plain on its plain language that it does need to come from the registrant. And so Congress decided, and we can quibble about whether or not they should have imagined all the kind of systems that would be available in 1993, but Congress said in order for us to be confident that a registrant could be removed without notice and waiting, it did need to come from the registrant. But there's specific evidence in the record that this system- But Mr. Fisher says it does come from the registrant. It's just that the registrant didn't tell Indiana directly. The registrant told Minnesota, and Minnesota told Kansas, and Kansas told Indiana. Your Honor, at best, at best, cross-check output comes from the voter registration database, not from the voter registration form. And there is evidence in the record that there are inherent errors in voter registration forms. And one of the examples we gave in Dr. McDonald's exhibit was that 2% of voter registration records across the country list January 1st as a registration date, which is not possible because nobody's processing voter registration forms. Also in Dr. McDonald's exhibit, it indicated that when you do these large-scale matching, because workflow processes are different, you're going to have problems in the merging of the records to have one database talk to another. But what I think is highly relevant in this instance is that plaintiffs are not disputing that a completed voter registration form in another state might qualify as a request of the registrant or a written confirmation because it's from the registrant. It confirms a new address. It is indicating an authorization to be registered somewhere else. But cross-check output is not that. It is not a voter file-sharing system where the registration forms are uploaded and Indiana or anybody else could actually observe them. It is not even purport to be derived from the voter registration database. And there's one really key part of this, and that is the date of determining whether or not which record is older. Cross-check requests the last date of a voter-initiated contact, which is not the same thing as a voter registration form. If y'all don't understand what that term is, you're not alone. There were, in fact, 13 of the 30 states participating in cross-check that didn't even provide a definition. So we don't know what that looks like in the state of Washington. It's just when someone decided to update part of their mailing address. So when one is using cross-check... So if somebody in Washington updated their mailing address to add the last four digits of the zip code, that would count as a change? We don't know the precision, Your Honor, because the definition doesn't get into that particularity. But what we do know is that half the states, including Indiana, don't even define what that term means. And therefore, it is impossible for cross-check to purport to know which record is older and which record is completed, if they even identified the right person. And the record evidence is that there is a high probability that voters are going to get confused. So the change... I'm just trying to imagine what kinds of changes would not trigger the concerns under this statute, but yet would count as changes. So adding the last four digits of the zip code, that's still the same address. Moving within the same precinct, I presume, doesn't have any voter implications. Perhaps someone is changing, depending on the state, perhaps someone is changing on where a mail ballot is going to be sent. Or you could change from your maiden name to your married name and still be you. Right. So what's relevant, Your Honor, is that one cannot rely on the date that is provided in the cross-check output as an indication of a voter requesting to be removed or requesting to be registered in another state, because it doesn't even ask for that. And again, to the extent to which a state is choosing to use the date of voter registration from the database as their voter-initiated change, then it's going to inherit whatever errors are already in the database. And as I indicated earlier, there's at least a 2% error with most of the dates of voter registration. Now, can I just clarify something? Yes, Your Honor. As I have looked at this case, I don't see anything at all wrong with Indiana using the cross-check database as a trigger for inquiry to the voter. So they can get names from this and they can say, you know, the following 200 people we're just not sure of. And if they then send a direct letter to the voter and use that system, I take it you wouldn't have any problem. That is correct, Your Honor, and that's what Indiana did prior. What they used to do. What they used to do prior to the change in the law that put in place. As far as you're concerned, I just want this on the record, that that's an acceptable use. It reflects the state's concern to make sure the real voter list is accurate. The Supreme Court in the Houston case said that states are permitted to use inferences of moves. And in fact, the NVRA itself sets forth an example of it. It sets forth that states may use the national change of address. And that is actually a really good analog for us to consider. What happens in that instance? A voter or an individual fills out a piece of paper that says I want my mail moved somewhere else. It gets compiled. It gets put into a database. That database gets sent to election administrators. Election administrators are able to look at it, but they have to send the notice and they have to send the waiting period. And I think cross-check is best understood to be a 20th century version of the national change of address because it does not have the directness coming from the voter going to the election administrator. Your Honor, if I may, Judge Wood, you noted something about the literalness of this. But what I would want to submit to this court is that it's not just empty formalism. There's actually common sense and good practices animating these concerns. Before we get there, let's talk about standing a little bit. Yes, please. I want to draw a distinction between the objectives of the organizations and the operations of the organizations, and I know that you're speaking for three here. Yes, sir. Can you outline for us what Indiana statute did to impair each of your clients' operations? Sure. Certainly, Your Honor. And, again, this was a matter on preliminary relief, and therefore we are alleging both how we've already been injured and then what we will be injured in the future. And it varies because they're different clients. So taking them in turn, they all argue that they were unable to do some of the education of voters. They usually educate voters on things like polling place locations and other election rules, and this SEA 442 required them to spend a bulk of their time doing that. It took up a number of the moments that they had to spend monitoring calls because they all take calls in from voters, and instead of being able to answer other calls, they had to spend a disproportionate amount of time explaining this because it is hard to understand. Was that tracked? What I'm trying to get at is, is there a service that your clients were providing post-legislation that's different than the services your clients were providing pre-legislation? Your Honor, they're having to provide different services. So instead of advocating for working with polling place hours or early voting or redistricting form, they then had to shift their resources in this way. And I want to make very, very clear that Havens sets forth that organizations like the plaintiffs have standing when they have to divert their resources and frustrate their mission. So can I ask about that? I mean, so there's a diversion theory that is enough to satisfy injury in fact, but what I found useful was to go back to the source, basically back to the Supreme Court's standing cases, and in particular the cases in which they've discussed injury in fact, and that's the branch of standing that we're on, the Court says. That's a particularly important part of things. And so it seemed to me that injury in fact certainly could occur from diversion of resources, which was what happened in the now superseded Crawford opinion of this Court. Obviously the Supreme Court had the last word on Crawford. But I wonder if the record also has anything to say about whether the statute required your plaintiffs to increase their expenditures. I would think an incremental increase in expenditures would also certainly be an injury in fact. It's concrete. It's particularized. Well, we do know, Your Honor, that at least two of the plaintiffs that register voters, and that's the League of Women Voters and the NAACP, were able to register fewer voters, and they weren't able to do things like driving voters to the polls because they had to be instead driving to election administrators to understand how they were going to operate this and talking to legislative officials. And let me concentrate on that. I've got the Bowling-Williams affidavit, the Vaughan affidavit, and the Anderson affidavit. I don't see that in those affidavits. Your Honor, they are in. I can get you. So if you look again at docket number 41 for the NAACP brief and docket 43, I'm sorry, 44 for Anderson and docket number 43 for Bowling-Williams, in there it indicates that they weren't able to give voter rides. They had to not do things like voter education forums because they were spending things like this. They were having to deal with longer phone calls and that kind of thing. But I also want to talk about what would happen if it went into effect. And before you get there, the district court made that specific finding, didn't she, about the diversion. She did not make a finding about increase in funds, but she did make a specific finding about diversion. Yes, she did, Your Honor. But, like, let's imagine what would happen if SEA 442 was actually able to go into effect. The NAACP and the League of Women Voters would spend all these times registering voters. Then they would not know whether or not they remained on the rolls because cross-check could pull them off. And then they would have to spend all these resources trying to monitor whether or not their folks stayed on the rolls. And then they would have to, if they were removed from the rolls, would have to do the advocacy to get them back on the rolls and talking them into getting re-registered again. So I think we have more than met our standard for injury in this instance. And it has been the theory that the state is pronouncing flies in the face of over 40 years of standing doctrine because they're effectively trying to say that because we have a mission of making the election process function better and bring more people into the system that we don't have a cause for standing. And that, Your Honor, would be like telling the fire department. It's a little weird. So if you're a garden club, you have better standing to challenge this Indiana law than an organization that focuses on voting. The example I was about to use, Your Honor, is that the defendants would like this court to rule that an arsonist doesn't hurt a fire department just because it's their mission to put out fires. And that is inconsistent with not only what the Supreme Court has said on standing, but what this court has said in accepting a diversion of resources theory of standing. And in this case, they are not contesting that our clients have had to be injured. They're not disputing that we have had to spend time talking to voters, that we have not been able to do advocacy like for redistricting form. I think it's a level of generality argument. You're saying your mission is to help people vote. You're still helping people vote. Ergo, no diversion. And your argument focuses on the next level of granularity, saying, of course, we're trying to help people vote, but we used to be able to do it by informing them of where their polling place was and helping them get registered and maybe giving them an advanced copy of what the ballot is going to look like from the Internet or whatever. And now we're running around the country trying to make sure that they haven't been tossed off the ballot. Well, and also, again, that is just what's in the docket, and what has been put before the record is the injuries that have happened thus far. Again, if crosscheck were to go into effect, we would have to expend more resources monitoring to make sure that the voters at the NAACP and the League of Women Voters Registered weren't removed from the rolls. And that is not too dissimilar from what this court concluded in the Crawford case, which is the Democratic Party, instead of being able to take its supporters to the polls, ended up having to deal with the voter ID law. It's the same sort of legal theory. On the question of associational standing, did you identify in the record any individual members of your organizations who would be impacted by this law? We did not, Your Honor. What we did submit in the record was that the NAACP was especially concerned because crosscheck has had a habit of disproportionately flagging people of color because of the prevalence of certain names among communities of color, and the district court did acknowledge and credit that particular concern. We did note that in the Arcia, in the 11th Circuit case, and the Sandusky case in the 6th Circuit, that when it was a purge that had not happened yet, we weren't expected to identify a particular person. In this instance, because of the haphazard nature of crosscheck and because they took away the notice, we are not able to identify specific people. We would be in a very, very different posture, we think, Your Honor, if they had been providing notice and then we came and said we couldn't identify anybody. We're not going to find out who's been injured until Election Day. Was there anything in the record below about what percentage of Indiana's registered voters belong to any of your organizations? What was in the record, Your Honor, is that the combined total of all of them was about 18,000 people. And I would be very, very clear that those three organizations, in addition to having their own members, have a larger constituency. They have a zone of interest that goes about protecting everyone's right to vote, and they would not deny assistance in registration if someone called them in one of their hotline, even if it wasn't a member. So at this point in time, we have not identified an additional member, but when we're talking about pre-implementation relief, we believe that the case law is pretty clear that all we need to do is to be able to show that it's pending. What would be an example of a voter registration law that Indiana could pass that your client would not have standing to challenge? Your Honor, I, at this point, can't imagine all sorts of hypotheticals, but something that didn't impact voters. Something that changed how election administrators are supposed to put paper on cardstock or indicated the change of the ballot, provided that it wasn't readable. The standing doctrine does demand that we show an injury, and in this instance we've shown it because this is something that is going to be harming voters and is something that is contravention to the law. I would note that if Indiana goes to a computer, just do it from your home computer system of voting, would that be something that would be challengeable? Your Honor, I wouldn't be more specific, but probably not, Your Honor, because it would just be one method of online registration versus another. I would, to answer your question, though, Judge, the plaintiffs qualify as someone who can bring a private right of action under the National Voter Registration Act, and it specifically uses the term persons aggrieved, and it used the term persons aggrieved to fall in line with the way the Fair Housing Act had used persons aggrieved, which was clear to extend Article 3 standing as far as it would go. So right now we have clients who have been injured. We have clients who will be injured, and we have clients who are understood to be in the zone of interest protected by the National Voter Registration Act. From our perspective, we've got one paragraph, though, in the district court's opinion that deals with this, and then we've got the record, and with all due respect to the statements being made, we have to rely on the records before us, and one of the things we've got to look at is that level of detail as to what happened to the organizations, what was the nature of the diversion of resources, how many resources, what was different before and after the law, and that's what I'm struggling with, and if you could give more detail on that. Your Honor, I would note that the standing theory on the part of the defendants have changed so much that it is not surprising. Put that to the side. No, well, the reason, though, Your Honor, is that's why, to the extent to which Your Honor does not feel like there's more there, there is more there. There's more there in the record. Again, all three of the plaintiff declarations indicate that they were not able to educate voters to the extent, they were not able to do advocacy, they had to take more phone calls answering these questions, and that in the future they're going to have to spend more resources doing this that's going to take away from their other important work. I would note that none of these plaintiffs challenged the prior version of the law that is in place that used cross-check, so when Your Honor was looking for a concern about a bright line or a limiting principle, it wasn't invoked until this particular statutory concern was indicated, and importantly, because the plaintiffs are folks who can sue on behalf of NVRA violations, it would be very peculiar to not conclude that they don't have standing in this interest, especially under a diversion of resources theory. So you're indicating that the statutory language within the NVRA of persons aggrieved is sufficient to grant each of your three organizations standing in this case? What I'm saying, Your Honor, is that that is completely consistent with a finding of statutes. I mean, I would note that no fewer than eight courts in the last 10 years have found that organizations like my clients have found standing to challenge an NVRA case, including one in the Southern District, and that's not even talking about the case like the Houston case, which went all the way to the Supreme Court, and the Supreme Court ruled, and it wasn't even listed, and that's also, Your Honor, not including the scores and scores of cases in which plaintiffs challenged other provisions under the NVRA. The NVRA makes very, very clear that organizations like the plaintiffs are within the zone of interest protected, and being that this court, like every other, follows the Supreme Court's decision in Havens, we more than sufficiently have shown that we have diverted resources and our missions have been frustrated, and importantly, they will be so more if this preliminary injunction is lifted, because they will have to spend time monitoring voters because they will not know if any one of the persons that they registered is going to stay on the rolls long enough to be on Election Day. They're going to have to observe and follow up. They're going to potentially have to re-register other voters, and that is more than sufficient for what standing has been found in this instance. All right. Thank you very much. Mr. Fisher. Thank you, Your Honor. I just want to make a couple of very brief points. First, the plaintiffs were focused today on the problem with the date and what you're going to get back from cross-check concerning the date of the new registration, and I just want to stress that the obligation of the county voter officials includes to confirm the date to make sure that the date of the out-of-state registration is after the Indiana. Now, we haven't ever had to implement this, or we haven't been able to implement this. We don't know what that's going to look like, and that's part of the problem as a pre-enforcement challenge and what really ought to be an operational challenge, if anything. It's not yet been given a chance to operate. Now, with respect to the use of cross-check as a system for conveying information about voters, I also want to draw the court's attention to page 79 of the appendix, because this is an outline of different procedures from the Indiana Election Division, and it's talking here about death certificates, and it talks about how a county voter registration office may cancel a voter registration due to death when notified in one of the following ways. It doesn't have to come directly from the county health department or the department that issued the death certificate. In fact, under number five, you can receive a notice from the Indiana Election Division of out-of-state deaths through the state and territorial exchange of vital events system. So I just want to point out, there are other scenarios where we use these common systems to convey information, and it's not always coming directly from the original source. There's nothing further. Mr. Fisher, if the court concludes that the cross-check data is not a request or not a confirmation, do the confidence factors change that statutory analysis? Well, if the request is, if the new voter registration is not a request or a confirmation, well, I think that probably we just, that's the end of it. I mean, if there's no request or confirmation, I mean, that's our theory of the case. But our whole point is, those are requests and confirmations, and then backed up by the confidence factors. And I don't understand the other side to be now disputing that those are requests. I think the dispute now is whether that has to come directly or whether it can go through a cross-check. Thank you. All right, thank you very much. Thanks to all counsel. We'll take case under.